## EXHIBIT 2

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>TS EMPLOYMENT, INC.,<br><br>                  Debtor. | Case No. 15-10243-mg<br><br>Chapter 11 |
| JAMES FELTMAN, not individually but solely as chapter 11 trustee for TS Employment, Inc.,<br><br>                  Plaintiff,<br><br>      v.<br><br>KOSSOFF & KOSSOFF LLP and IRWIN KOSSOFF,<br><br>                 Defendants. | Adv. Pro. No. 18-01649-mg |

## SECOND AMENDED COMPLAINT

Plaintiff James S. Feltman, not individually but solely as chapter 11 trustee ("Trustee" or "Plaintiff") for the bankruptcy estate of TS Employment, Inc. ("TSE"), hereby states for his complaint as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding by TSE's bankruptcy estate against Kossoff & Kossoff LLP ("K&K") and its principal, Irwin Kossoff ("Kossoff" and together with K&K, the "Defendants"), ~~TSE's former accountant.~~ who performed and controlled substantially all of TSE's financial reporting, tax and accounting functions. As a result of Defendants' conduct, TSE and its creditors suffered more than $100 million in losses before TSE ultimately filed for bankruptcy protection in February 2015.

2. Until its bankruptcy, TSE served as the professional employer organization ("PEO") for Corporate Resource Services, Inc. ("CRS") and its subsidiaries (the "CRS Subsidiaries" and, together with CRS, the "CRS Debtors"), a group of publicly traded staffing businesses. As the PEO, TSE was the employer of record for hundreds of thousands of temporary workers supplied under the CRS Debtors' contracts with their customers.

3. CRS experienced dramatic growth from 2010 to 2015 by offering its customers competitive pricing and financing options, which were attractive differentiators. CRS's ability to expand its business rapidly was in large part dependent upon accounts receivable financing provided by Wells Fargo and in part dependent upon purported financial accommodations made by TSE, including the forgiveness or deferral of more than $70 million owed to TSE under its PEO agreement with CRS.

4. TSE never had the capital or liquidity needed to make financial accommodations to CRS. TSE was operated in a manner that concealed a multi-year scheme to defraud the United States Treasury by systematically misreporting payroll tax obligations. This fraudulent and coordinated scheme required carefully managed financial reporting and false tax reporting activities which were performed and overseen by Irvin Kossoff.

4.5. Since TSE had no other means of creating working capital to provide financial accommodations, TSE "financed" its accommodations to CRS by willfully failing to pay federal employment taxes for TSE employees that were supplied to CRS customers, as well as other obligations. Moreover, most of TSE's funds were commingled in the accounts of its affiliate, Tri-State Employment Service, Inc. ("Tri-State" and collectively with its wholly-owned subsidiaries, "Tri-State Group"), where tens of millions of dollars were used for purposes unrelated to TSE. As

a result, TSE ultimately failed to pay more than *$100 million* (exclusive of interest and penalties) in federal employment tax obligations, as well as other non-tax obligations.

1.    Defendants acted as TSE's accountant since its incorporation in 2010. They provided accounting services to TSE, kept its books and records, prepared TSE financial statements, prepared dozens of TSE tax returns, and had direct and unfettered input and access to TSE's financial reporting systems.

56.    From 2011 forward, TSE was insolvent and engaged in an unsustainable and woefully under-capitalized business. TSE had no chief financial officer or treasurer, no accounting personnel and no employees of its own to carry out its core financial and accounting operations. Instead, these functions were performed by Defendants, who ostensibly acted as Tri- State's and TSE's outside accountants but exercised direct, complete, and virtually exclusive control over the financial reporting systems and internal accounting functions of TSE. These financial related duties included the preparation of federal and state payroll and withholding tax returns and the weekly determination of how much TSE would deposit with the United States Treasury to satisfy ongoing payroll tax obligations.

67.    Defendants controlled, maintained, and made adjustments to TSE's books and records and financial reporting systems and decided how to account for TSE's business activities. Defendants also regularly exercised decisionmaking authority over financial matters involving TSE, Tri-State, and other Cassera businesses. And it was Defendants—and not any other officers or employees of TSE or Tri-State—that prepared the journal entries hiding massive tax liabilities; prepared and filed TSE's inaccurate tax returns; provided information to TSE's auditors; and prepared false financial statements. Defendants' actions hid this realityTSE's financial condition from the outside world, thus permitting TSE to continue amass unpaid liabilities while its corporate life was wrongfully prolonged.

78.     Kossoff has admitted as much. In an April 22, 2015 declaration filed with the Court, Kossoff conceded, among other things, that at the end of 2013, he made a journal entry "moving" $67 million in unpaid TSE payroll tax liabilities from TSE's books to Tri-State's books, supposedly because Tri-State was going to pay those taxes. Defendants also prepared false tax returns for 2013 incorrectly stating that TSE's payroll taxes had been paid. As a result, TSE's 2013 year-end balance sheet and tax returns failed to reflect its massive insolvency and unpaid tax liabilities, and TSE was able to continue operations. Kossoff reversed that the $67 million journal entry for unpaid payroll taxes after the year end 2013 audit was completed as he knew that Tri-State had significant unpaid payroll tax obligations of its own and had no capacity to satisfy TSE's delinquent payroll tax obligations.

89.     The Trustee brings this complaint against the Defendants to recover more than $100 million in losses that would have been avoided had Defendants provided competent accounting services to TSEnot engaged in the conduct complained herein.

## JURISDICTION AND VENUE

9.10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this is an adversary proceeding arising in and related to the chapter 11 case *In re TS Employment, Inc.*, Case No. 15-10243, pending in the United States Bankruptcy Court for the Southern District of New York.

10.11.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.12.     This adversary proceeding is not a core proceeding.

12.13.     The Trustee consents to entry of final order or judgment by this Court.

**THE PARTIES**

13.14.    Plaintiff James S. Feltman is the chapter 11 trustee for TSE and the CRS Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for this region on February 27, 2015 and September 22, 2015, respectively.

14.15.    Debtor TSE is a Florida corporation, with its principal place of business in New York. At all times relevant to this complaint, Robert Cassera ("Cassera") directly or indirectly owned of 100% of the issued and outstanding stock of TSE, and held himself out as TSE's president.

15.16.    Defendant K&K, an accounting firm, is a limited liability partnership located in Goshen, New York. K&K provided accounting services for TSE from 2010 through 2015, and provided accounting services for Tri-State Group entities and/or Cassera from 1995 until at least 2015.

16.17.    Defendant Kossoff is an individual residing in Boca Raton, Florida. At all times relevant to this complaint, Kossoff was a principal of K&K, and was the lead partner for K&K's engagement with TSE and the Tri-State Group.

**FACTS**

**The Staffing Business**

17.18.    Tri-State is a New York corporation with its principal place of business in New York. Cassera directly or indirectly owns 100% of Tri-State's issued and outstanding stock, and at all times relevant to this complaint was the president and a director of Tri-State.

18.19.    Cassera founded Tri-State in 1993 as a temporary staffing company. The company grew in size over the next 15 years, including through acquisitions that became part of the Tri-State Group. Over time, corporations within the Tri-State Group began to serve as the PEO for staffing businesses within the Tri-State Group, and for other staffing businesses owned by Cassera.

19.20.    By 2010, the Tri-State Group had become a national provider of staffing, recruiting,

and consulting services, with a focus on light industrial services, clerical and administrative support and insurance related staffing.

20.21.    In 2010, Accountabilities, Inc. (one of the CRS subsidiaries), which at the time was directly or indirectly majority-owned by Cassera, completed a holding-company reorganization and became a wholly owned subsidiary of CRS (incorporated the previous year); CRS became a publicly-traded company; and Cassera became the direct or indirect majority owner of CRS. Thereafter, CRS began pursuing a strategy of rapid expansion by acquiring businesses from Tri-State, Cassera and competitors.

21.22.    By the end of 2013, the CRS Debtors had more than 800 employees and operated in over 200 locations. CRS's gross revenue had grown from $120.9 million in fiscal year ending September 30, 2010 to $819.7 million in 2013. In 2013, the CRS Debtors placed approximately 150,000 temporary workers with approximately 5,000 customers.

22.23.    CRS's apparent success in large part derived from its ability to provide customers with temporary and seasonal workers at competitive rates, and its access to working capital to fund acquisitions and provide customer financing. The CRS Debtors were thus able to offer an expanding customer base—including a number of Fortune 500 companies—competitive pricing and short-term financing to help them to more evenly distribute the expense of seasonal staffing, an attractive differentiator from many other staffing companies.

23.24.    Much of CRS's access to liquidity and working capital was attributable to financial accommodations purportedly made by TSE.

24.25.    Pursuant to an agreement dated August 27, 2010 (the "PEO Agreement"), TSE agreed to provide PEO services to CRS. As the PEO, TSE was the co-employer of record for the hundreds of thousands of temporary or seasonal workers sourced by the CRS Debtors for their customers, and was responsible for the payment of temporary worker's wages and payroll, remittance of

withholdings, payment of employer taxes, risk management, underwriting, and payment of workers' compensation insurance and expenses.

25.26.    In exchange for its PEO services, TSE was entitled under the PEO Agreement to be reimbursed by CRS for all compensation paid to temporary workers, the employer's share of taxes, workers' compensation expenses and similar costs, plus an "administrative fee" purportedly representing the cost of TSE's services and profit. TSE billed CRS for the payroll- tax and related obligations it incurred on behalf of the CRS customers, plus its administrative fee. CRS then typically passed those charges along to its customers, plus an additional fee for its own services.

26.27.    As described in paragraphs 41.44 to 45.48 below, TSE forgave or deferred the collection of tens of millions of dollars owed by CRS under the PEO Agreement, thus facilitating the CRS Debtors' competitive customer contracts and rapid expansion of their business.

**TSE Was Dominated By Tri-State**

27.28.    From its inception, even though it was not a Tri-State subsidiary, TSE had no real existence as a business separate from Tri-State, and was completely dominated and controlled by Tri-State.

28.29.    TSE never had any board meetings at which officers were appointed, and on information and belief, no shareholder or director resolutions ever were executed in lieu of meetings. TSE did not even maintain a corporate minute book or corporate  record  book. Officers and agents of Tri-State acted as *de facto* management for TSE, exerting total control over TSE's operations. This included the Defendants, who exercised direct, complete, and virtually exclusive control over the financial reporting systems, tax and internal accounting functions of TSE.

29.30.    TSE had no offices independent of Tri-State, and instead "resided" in the same space occupied by Tri-State at its 160 Broadway, New York, New York offices.

30~~31.~~ TSE had no employees, excluding the temporary workers provided to CRS customers. For example, TSE had no employees of its own to carry out its core financial and accounting operations, nor did any TSE employees carry out basic PEO functions such as preparing W-2s or payroll tax returns for temporary workers.

31~~32.~~ Tri-State's complete dominance over TSE extended to TSE's cash. To enable the CRS Debtors to provide short-term financing to their customers, as well as for their own business purposes, the CRS Debtors established a receivables financing relationship with Wells Fargo Bank, N.A. ("Wells Fargo"). In connection with that financing relationship, the CRS Subsidiaries pledged their customer receivables as security to Wells Fargo, and the loans were guaranteed by CRS.

32~~33.~~ As the CRS Subsidiaries' customer receivables were collected by Wells Fargo and new CRS Subsidiaries' customer receivables were created and pledged to Wells Fargo, Wells Fargo advanced funds to the CRS Subsidiaries, typically on a daily basis. The CRS Subsidiaries in turn remitted to TSE most of the proceeds of the Wells Fargo advances pursuant to the terms of the PEO Agreement so that TSE could pay temporary worker wages, employment taxes and workers' compensation expenses associated with employees supplied by TSE to the CRS Subsidiaries' customers.

33~~34.~~ Virtually each day, after the CRS Debtors made their payments to TSE, Tri-State transferred TSE funds from TSE accounts to Tri-State Group accounts, where they were commingled with Tri-State Group funds. The Tri-State Group entities and Cassera then used the funds for a variety of purposes, many unrelated to TSE or the CRS Debtors.

34~~35.~~ Tri-State ensured that TSE's basic payroll obligations to temporary and seasonal workers were met, and caused TSE's payroll accounts to be funded, thus keeping the Debtors' businesses (and the flow of funds from the CRS Debtors to TSE to Tri-State Group) alive, at least temporarily. But as described in paragraphs 41~~44~~ through 45~~48~~ below, beginning in 2013 at the latest, Tri-State Group

8

entities began failing to remit large amounts to taxing authorities on account of TSE's payroll tax-related obligations, causing them to go unpaid.

**Defendants' ~~Roles~~Relationship with TSE and Tri-State**

~~35~~36.    Since at least 1995, Defendants have been providing ~~outside~~ accounting services to Tri-_State Group entities and/or Cassera. After TSE was incorporated and began providing PEO services to CRS in 2011, Defendants expanded the scope of their work to provide ~~outside~~ accounting services to TSE as well. Defendants performed a wide range of accounting and related services for Tri-State and TSE, including performing many of their core financial reporting functions.

~~2        Defendants performed a wide range of accounting and related services for Tri- State and TSE, including performing many of their core financial reporting functions.~~

~~3.        Defendants had direct and unfettered access to Tri-State's and TSE's financial reporting systems, and directly made adjustments, ledger entries and journal entries in Tri-State's and TSE's financial reporting systems.~~

~~4.        In addition, Defendants prepared all of the federal and state income, payroll, and other tax returns for both TSE and Tri-State.~~

~~36~~37.    Kossoff in particular was intimately involved in Tri-State's and Cassera's businesses. Kossoff and Cassera traveled together regularly by private jet from Florida to New York, where Tri-State and CRS were headquartered. They met frequently concerning Tri-State and Cassera's businesses, and Kossoff was regularly consulted about all financial matters involving Tri-State and Cassera's other businesses. Indeed, after TSE's massive unpaid tax liabilities were discovered, it was Kossoff who made presentations on behalf of Cassera to CRS's board of directors, claiming that the unpaid payroll tax liability was a "surprise" and had been "unknown."

**Defendants' Involvement in Tri-State and TSE**

38.        At all relevant times, TSE did not have a CFO or Treasurer. Nor did TSE or Tri- State

have any employees with the background and experience to report the entities' multi- billion dollar cash flow. Instead, Defendants exercised direct, complete, and virtually exclusive control over the financial reporting systems, tax and internal accounting functions of TSE and fulfilled the roles ordinarily carried out by a company's senior internal financial and accounting personnel.

39. Defendants acted with autonomy, and their conduct was their own. Their decisions facilitated TSE's massive fraud. Defendants managed TSE's financial reporting, tax and internal accounting activities and exerted unfettered influence over decisions that affected the Debtor's finances and operations.

40. Defendants controlled, maintained, and made adjustments to TSE's books and records and financial reporting systems and decided how to account for the Debtor's business activities. For example, in a submission to this Court, Kossoff explained how he caused a year- end intercompany general ledger entry to be recorded eliminating the $67 million federal payroll tax liability on TSE's books, and causing the $67 million federal payroll tax liability to be reflected on Tri-State's books. *See Declaration of Irwin Kossoff in Support of Objection to Ex Parte Application of Chapter 11 Trustee* ("Kossoff Declaration") ¶ 16 (TSE Dkt. No. 99~~TSE's Purported~~). The Kossoff Declaration is attached as Exhibit A to the Complaint.

41. Defendants also interfaced independently and directly with TSE's auditor Lilling & Company concerning its audits of TSE's finances for years ended December 31, 2012 and December 31, 2013. Defendants were the source of the information needed for TSE's auditors to perform those audits, and information requests were directed at Defendants, not others at TSE.

42. Defendants also prepared all of the federal and state income, payroll, and other tax returns for TSE, and compiled the underlying information needed to prepare those returns.

43. In sum, Defendants were not third parties acting at the direction of management— they *were* management.

## TSE's Financial Accommodations to CRS

37.44.    In order to provide the liquidity and working capital financing for CRS's third- party acquisitions and help cover the substantial overhead costs associated with CRS's public- holding-company structure, Tri-State caused TSE to forgive or defer tens of millions of dollars of CRS obligations to TSE, and to provide additional financial accommodations to CRS.

38.45.    By the fiscal year ended September 30, 2011, CRS's first full year of operations as a public company, CRS already had deferred payment to TSE of more than $11.4 million in obligations arising under the PEO Agreement. The amount was converted to a "related loan payable" on TSE's books as of October 1, 2011, and continued to grow throughout 2011 and 2012.

39.46.    In May and July 2012, respectively, CRS and TSE entered into two agreements under which TSE accepted CRS common stock in satisfaction of $14.1 million of the related loan payable to TSE by CRS. However, even after reducing the loan balance by $14.1 million,  as of CRS's fiscal year ended September 30, 2012 the related party loan balance had again  grown to $7.7 million, excluding more than $15 million that was additionally owed by CRS to TSE for wages and other employee obligations that were being paid on a current basis. TSE did  not have capital or a source of liquidity to fund deferred payment of these obligations.

40.47.    By CRS's fiscal year ended January 3, 2014, CRS's intercompany payable to TSE had grown to approximately $25 million ($10 million of which was classified by CRS as a current liability). Just as TSE did not have capital or a source of liquidity to absorb the non-cash satisfaction of the CRS receivables in 2012, it did not have capital or a source of liquidity to absorb deferral of payment of this receivable from CRS in 2013.

41.48.By June 2014, CRS's intercompany indebtedness to TSE had increased to more than $50 million, roughly $35 million of which was being classified by CRS as a current liability.  By

September 30, 2014, that intercompany indebtedness stood at more than $55 million, roughly $40 million of which was being classified by CRS as a current liability.

**TSE and the Tri-State Group's Massive Unpaid Tax Liability**

42~~49.~~ TSE never had the capital or liquidity needed to make financial accommodations to CRS described in paragraphs 41~~44~~ to 45~~48~~ above. TSE had no credit lines or bank borrowings. The CRS Debtors were TSE's only customers and were the sole source of TSE's revenue and cash flow.

43~~50.~~ TSE "financed" many of its financial accommodations to CRS by failing to pay more than $100 million (exclusive of interest and penalties) in federal employment taxes for TSE employees supplied to CRS customers, as well as other obligations.

44~~51.~~ A pattern of significant federal tax late payments and non-payments at Tri-State (and later TSE) began at the latest in 2009. In February 2011, the IRS filed a tax lien against TS Staffing, a Cassera-owned company acquired by CRS later that year, for $830,000 in unpaid 2009 taxes. In 2012, the IRS notified TSE-PEO, Inc. that it was late on $18.9 million in taxes for the previous year; in March 2014, the IRS notified TSE that it was behind on $600,000 in taxes for 2012; and in June 2014, the IRS notified Tri-State that it had not paid $7.6 million in taxes for 2012 and $23.5 million in 2013.

45~~52.~~ By the end of 2013, TSE's books reflected that a massive $67 million unpaid federal payroll tax liability. Effective as of the end of 2013, Defendants recorded a year-end intercompany general ledger entry which eliminated the $67 million federal payroll tax liability from TSE's books, and caused the $67 million federal payroll tax liability to be reflected on Tri- State's books. Effective as of the end of 2013, Defendants recorded a year-end intercompany general ledger entry which eliminated the $67 million federal payroll tax liability from TSE's books, and caused the $67 million federal payroll tax liability to be reflected on Tri-State's books. Even if Tri-State had legitimately intended to eventually satisfy and pay TSE's payroll tax obligation, the elimination of

the liability on TSE's books and financial statements was wholly improper and inaccurate inasmuch as TSE of course remained liable for its own tax obligations until they were actually paid.

46 53.    Defendants also masked TSE's non-payment of its critical payroll tax liabilities by causing TSE to file inaccurate tax returns. Defendants prepared and filed on TSE's behalf Form 941 returns indicating that all of TSE's payroll taxes had been paid, when in fact they had not.

47 54.    Defendants also prepared and filed quarterly payroll tax returns which underreported TSE's payroll tax liability during the first, second and third quarters of each of 2012, 2013, and 2014. As a result, TSE was able to "defer" recognition and payment of those taxes until the fourth quarter of each year, and Tri-State and Cassera would have access to significant amounts of cash in the interim.

48 55.    In late 2014, the 2013 year-end general ledger entry referenced in paragraph 49 52 above was "reversed" by Defendants, and the $67 million federal payroll tax liability "re- appeared" on TSE's financial statements. Significant portions of TSE's 2014 federal payroll tax liability also had gone unpaid in the interim. By the time TSE commenced its bankruptcy case  on February 2, 2015, its unpaid federal payroll tax liabilities had ballooned to more than $100 million, not including penalties or interest.

49 56.    Not surprisingly, Tri-State Group entities also had been failing to pay their own payroll taxes. Tri-State Group entities, for their part, had amassed an additional roughly $105 million in unpaid federal payroll tax liabilities by February 2, 2015, not including penalties or interest. As the Tri-State Group entities' accountants, Defendants knew that Tri-State also had failed to pay its federal payroll tax obligations.

**Intercompany Claims**

50 57.    As indicated in paragraphs 27 28 to 35 above, TSE had no employees or business independent from Tri-State, and substantially all of its business functions were performed by officers

13

or employees of Tri-State. Tri-State and TSE entered into an agreement pursuant to which Tri-State charged an administrative fee to TSE in exchange for the services provided by Tri-State employees.

~~51~~58. Tri-State ostensibly charged TSE an administrative fee in 2012 equal to 1.75% of TSE's gross wages (a fee of roughly $9.5 million), and an administrative fee in 2013 equal to 1.45% of TSE's gross wages (a fee of roughly $9.4 million), and caused TSE's books to reflect those fees.

~~52~~59. As of December 31, 2014, as a result of (among other things) Tri-State's misuse of TSE's cash described in paragraphs ~~34~~33 and ~~35~~34 above, the TSE/Tri-State general ledger intercompany account reflected that the Tri-State Group entities owed TSE approximately $90 million.

~~53~~60. On January 30 and 31, 2015, as TSE's bankruptcy case was being filed, Defendants made a series of large journal entries on TSE's general ledger in the TSE/Tri-State intercompany account, which they dated as of December 31, 2014. Those entries had the effect of purporting to transform the large intercompany balance owed by Tri-State into a net liability to Tri-State owed by TSE.

~~54~~61. Kossoff further adjusted these entries in March 2015, subsequent to TSE's chapter 11 filing. Kossoff has acknowledged making these adjustments. ~~Declaration of Irwin Kossoff in Support of Objection to Ex Parte Application of Chapter 11 Trustee ("Kossoff Declaration")~~ Kossoff Decl. ¶ 12. ~~¶ 12, Dkt. No. 99.~~

~~55~~62. The historical 2011 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $7,278,514; the 2012 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $9,531,223; and the 2013 year-end financial statements prepared by Defendants reflected a total administrative fee owed by TSE to Tri-State of $9,374,512. Income tax returns prepared and filed

14

by Defendants on behalf of TSE reflected administrative fees consistent with those financial statements.

56.63.    Before Defendants made the eve-of-bankruptcy journal entries, TSE's books reflected a 2014 administrative fee owed by TSE to Tri-State of $14,267,586, which would have been generally consistent with the administrative fee charged in prior years.

57.64.    Defendants' eve-of-bankruptcy journal entries purported to debit the TSE/Tri- State intercompany account for tens of millions of dollars in additional administrative fees.  There is no documentary support for these entries in TSE's books and records, and they exceed the percentage administrative fee Tri-State reported that it was charging TSE by tens of millions of dollars.

**Workers' Compensation Costs**

58.65.    Workers' compensation insurance poses particular risks for PEOs and their insurance carriers. PEOs typically do not retroactively charge customers for workers' compensation claims as loss experiences are developed over time. Instead, the PEO typically charges each customer up front for the anticipated cost of its workers' compensation expenses, and bears the risk that it has underestimated its long-term workers' compensation liabilities. As the National Association of Insurance Commissioners ("NAIC") has explained, a PEO thus faces the difficult task of "analyz[ing] its development patterns, estimat[ing] its expected losses, select[ing] an appropriate safety margin and discount rate, and then allocat[ing] anticipated costs among its clients in a manner that allows it to remain competitive in the marketplace." NAIC, *Workers' Compensation Large Deductible Study* at 46 (2006) ("*Large Deductible Study*").[1]

---

[1] The Large Deductible Study is available at http://www.naic.org/prod_serv/WCD-OP-06.pdf.

59.66.  Failure to properly estimate and charge customers for workers' compensation costs can result in significant losses to the PEO and insolvency. If the PEO becomes insolvent, the workers' compensation insurance carrier is left to foot the bill for unfunded fees and costs.

60.67.  These risks are magnified if the PEO takes out a high-deductible policy. The NAIC further warns that "[a]n especially hazardous situation would occur if a PEO were allowed to use a small affiliated insurer to write a large deductible policy. The danger is that should the PEO become insolvent, either from its assumption of workers' compensation risk or for some other reason . . . , then its affiliated insurer would be likely to fail along with the PEO." *Large Deductible Study* at 48.

61.68.  Tri-State and TSE were among the largest customers of their workers' compensation insurer, Lumbermen's Underwriting Alliance ("Lumbermen's"). Lumbermen's had agreed to underwrite and administer a workers' compensation insurance program under which Tri-State and TSE (as an additional named insured) reimbursed Lumbermen's for a "deductible" of $1.25 million per occurrence for bodily injury and $1.25 million per employee for disease. This effectively meant that TSE, the employer of record for more than 100,000 temporary workers, was self-insured for all but the largest workers' compensation claims.

62.69.  The high-deductible policy under which TSE essentially was self-insured meant, in the short term, that TSE initially paid lower insurance premiums to Lumbermen's and purported to pass those savings along to CRS and its customers. However, TSE bore an ever-increasing risk of loss. As more and more workers' compensation claims were submitted and its loss experience developed, TSE became liable to Lumbermen's for tens of millions of dollars in deductibles and other obligations developed, TSE became liable to Lumbermen's for tens of millions of dollars in deductibles and other obligations associated with those claims, and could not pass those losses along to CRS's customers.

63.70.  Lumbermen's would regularly report potential future losses related to the workers' compensation program, but despite this identified risk of loss, and notwithstanding years of workers' compensation claims in the tens of millions of dollars, Defendants never reflected a single penny of reserves for any potential or accrued workers' compensation claims on TSE's books and records.

64.71.  The 2011, 2012, and 2013 year-end financial statements prepared by Defendants reflected TSE workers' compensation expenses of $11,656,666, $17,823,879, and $25,091,162, respectively, for those years.

65.72.  Defendants made eve-of-bankruptcy journal entries on TSE's books that purported to debit the TSE/Tri-State intercompany account for tens of millions of dollars in workers' compensation-related obligations dating back to 2012. Even though Defendants controlled and maintained TSE's books and records for TSE's entire existence, they had never previously caused these purported intercompany liabilities to Tri-State to be reflected on TSE's books, TSE's financial statements, or TSE's tax returns.

66.73.  Moreover, to the extent these journal entries legitimately reflected legitimate TSE workers' compensation obligations, they should have been reflected in TSE's books as a direct TSE liability to Lumbermen's, and not as an offset or charge against the TSE/Tri-State intercompany account. Tri-State did not satisfy and pay TSE's obligations to Lumbermen's. To the contrary, Lumbermen's was adjudicated to be insolvent and placed in liquidation after TSE's and Tri-State's obligations to Lumbermen's went unpaid, forcing Lumbermen's to book tens of millions of dollars of losses. Thus, it would have been improper to charge the intercompany accounts for such liabilities when they remained directly due and owing to Lumbermen's.

67.74.  The largest eve-of-bankruptcy journal entry made by Defendants purported to debit the TSE/Tri-State intercompany account by $56,533,828 for cash and securities held in a collateral account that had been pledged to Lumbermen's. Even though Defendants controlled and maintained

TSE's books and records for TSE's entire existence, they had never previously caused any such intercompany obligation to be reflected on TSE's books or financial statements.

68.75.   Moreover, as explained above, TSE's obligations to Lumbermen's have not been paid, and there is no accounting or other basis to treat the assets in the collateral account as having been applied in satisfaction of TSE (as opposed to Tri-State Group) obligations to Lumbermen's.

## COUNT I

### Accounting Malpractice/Negligence

69.76.   Plaintiff restates and re-alleges paragraphs 1 through 72 75 of this complaint as though fully set forth herein.

70.77.   An accountant has a professional obligation to exercise due care and to follow recognized and accepted professional standards in the exercise of his or her profession. For example, the Code of Professional Conduct published by the American Institute of Certified Public Accounts ("AICPA") requires accountants "to discharge professional responsibilities with competence and diligence," and "imposes the obligation to perform professional services to the best of [the accountant's] ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public." § 0.300.060.02.

71.78.   Additionally, both Kossoff and K&K were at all relevant times licensed in New York, and were thus required to practice their profession in accordance with New York laws and regulations. New York law prohibits "professional misconduct," defined to include practicing accounting "with gross incompetence, with gross negligence on a particular occasion or negligence or incompetence on more than one occasion." N.Y. Educ. Law § 6509(2).  New York regulations state that, to determine whether this provision has been violated, it is appropriate to consider "the generally accepted auditing standards and accounting principles promulgated by the [AICPA] and by the Financial Accounting Standards Board." 8 N.Y.C.R.R. § 29.10(a)(12).

18

72.79.    New York regulations further prohibit "unprofessional conduct," defined to include "grossly negligent failure to comply with substantial provisions of Federal, State or local laws, rules or regulations governing the practice of the profession." 8 N.Y.C.R.R. § 29.1(a)(1).

73.80.    A primary responsibility of an accountant is to ensure that a company's financial statements fairly and accurately reflect the true financial condition of the company. To that end, financial statements must be prepared and reported in accordance with the conventions, rules, and procedures recognized by the accounting profession as defining accepted accounting practices.

74.81.    As relevant to Defendants' preparation of TSE's financial reports, basic recognized and accepted accounting standards require that a liability should be derecognized only if the debtor is relieved of its obligation for the liability. For example, the Financial Accounting Standards Codification ("ASC") published by the Financial Accounting Standards Board, which is the authoritative source for Generally Accepted Accounting Principles ("GAAP"), contains the following provisions:

> ASC 405-20-40 (EXTINGUISHMENTS OF LIABILITIES, DEROCNIGION) – "A debtor shall derecognize a liability if and only if it has been extinguished. A liability has been extinguished if . . . a. The debtor pays the creditor and is relieved of its obligation for the liability. . . . b. The debtor is legally released from being the primary obligor under the liability, either judicially or by the creditor. "

> ASC 450-20-25 (RECOGNITION, GENERAL) – "An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: a. . . . [I]t is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. [and] b. The amount of the loss can be reasonably estimated."

75.82.    Recognized and accepted accounting standards also require that tax liabilities be accurately reflected in a company's financial statements. For example, the ASC provides:

> ASC 740-10-25-2 (INCOME TAXES, GENERAL RECOGNITION) – "A tax liability or asset shall be recognized . . . for the estimated taxes payable or refundable on tax returns for the current and prior years."

7683.    Moreover, federal law prohibits tax return preparers from preparing a tax return containing an understatement of liability that is due to an unreasonable position or to a reckless disregard of rules or regulations. I.R.C. § 6694(a), (b). State laws also require that a company's tax returns be free of misrepresentations regarding the amount of taxes owed by the taxpayer.

7784.    At all times relevant to this complaint, Defendants acted as accountants for TSE and the Tri-State Group entities. Among other things, Defendants controlled and maintained TSE's and the Tri-State Group entities' books and records. They also prepared and submitted TSE's and the Tri-State Group entities' corporate tax returns, state unemployment reports, and payroll tax returns to taxing authorities, and corresponded with federal, state and local taxing authorities regarding taxes.

7885.    Kossoff expressly acknowledged Defendants' position as TSE's accountant in ~~the April 22, 2015~~his declaration filed with this Court. (Kossoff Decl. ¶ 3 ("I have been the accountant for the Debtor since 2010 and the accountant for the other Tri-State companies ~~since 1995.~~. . . since 1995. K&K reviews and reconciles the books and records of the Debtor and the Tri-State Entities on a quarterly and ~~K&K reviews and reconciles the books and records of the Debtor and the Tri-State Entities on a quarterly  and~~ annual basis. ~~——~~. . .  K&K prepares the Debtor's and the Tri-State Entities' corporate tax returns, state unemployment forms, the form 941s which report the payroll tax withholdings to the [IRS] and correspondence with federal, state and local taxing authorities regarding taxes.").)

7986.    Kossoff acknowledged TSE's failure to pay massive payroll tax liabilities, and admitted that Defendants made the book entries "removing" these liabilities from TSE's books in 2013, then adding the liabilities back in late 2014. (Kossoff Decl. ¶ 16.) Defendants' "derecognition" of liabilities violated basic recognized and accepted accounting standards.

8087.    In addition, Defendants prepared and filed on TSE's behalf Form 941 returns incorrectly indicating that all of its payroll taxes had been paid, and also prepared and filed quarterly

payroll tax returns which underreported TSE's payroll tax liabilities. Defendants' failure to recognize current and prior tax liabilities violated basic recognized and accepted accounting standards, as well as federal and state laws applicable to tax return preparers.

81.88.    As a result of Defendants' masking of TSE's tax liabilities and their preparation and filing of incorrect tax returns, TSE was able to continue in business, transferring tens of millions of additional dollars to Tri-State Group entities and incurring tens of millions of dollars in additional liabilities that remain unpaid today.

82.89.    In addition, to the extent any of Defendants' eve-of-bankruptcy general ledger journal entries reflected legitimate TSE intercompany liabilities, Defendants' failure to cause these liabilities to be reflected on those liabilities, TSE books and records, financial statements, and tax returns in 2011, 2012, 2013, and 2014 violated recognized and accepted accounting standards.

83.90.    Moreover, to the extent any unpaid obligations to Lumbermen's are legitimately related to TSE, Defendants should have previously recorded these in TSE's books or financial statements as a direct TSE liability to Lumbermen's, and not as an offset or charge against the TSE/Tri-State intercompany account.

84.91.    As TSE's accountants, Defendants owed a duty to TSE to use the skill and care ordinarily used by a reasonable and competent accountant under the same or similar circumstances. Defendants breached their duty to provide accounting services to TSE at the required level of skill and care, as demonstrated by the gross failures and deficiencies described in this complaint.

85.92.    Defendants violated their duty of care owed to TSE by failing to record and reflect TSE's liabilities in accordance with recognized and accepted accounting standards and the professional standards of care. Defendants were negligent and acted recklessly in their performance of accounting services for TSE.

8693.　　Defendants violated their duty of care owed to TSE by, among other things, preparing and submitting financial statements and tax returns which included incorrect information and material errors, and which did not present fairly, TSE's financial position in conformity with federal and state law and basic recognized and accepted accounting standards.

8794.　　Defendants failed to provide accounting services in compliance with professional standards of care and applicable law by, among other things, masking TSE's failure to pay to tens of millions of dollars in federal payroll tax obligations in 2013 and 2014 and, assuming Kossoff'sthe Kossoff Declaration is true, by failing to properly record worker's compensation-related liabilities to Lumbermen's and TSE's intercompany liabilities to Tri-State Group entities in TSE's books and records, financial statements, and tax returns in 2011, 2012, 2013, and 2014.

8895.　　Defendants' negligence and/or recklessness enabled the uninterrupted flow of tens of millions of dollars from TSE to or for the benefit of the Tri-State Group and Cassera, and permitted TSE to continue to incur tens of millions of dollars of additional liabilities long after its business should have been shut down, all to the detriment of TSE creditors.

8996.　　Defendants' negligence and/or recklessness have proximately caused TSE to suffer damages in an amount exceeding $100 million.

## COUNT II

### Fraud

9097.　　Plaintiff restates and re-alleges paragraphs 1 through 7275 of this complaint as though fully set forth herein.

9198.　　Defendants intentionally or recklessly made numerous false representations in their capacity as TSE's accountants and tax return preparers. These false representations included but were not limited to making book entries hiding TSE's unpaid tax liabilities in 2013. They also included making false representations in the form of the false eve-of-bankruptcy journal entries or, if

~~Kossoff's~~the Kossoff Declaration is accurate, by failing to record liabilities in TSE's books and records during 2012, 2013, and 2014.

~~92~~99.    Defendants' intentional or reckless false statements also included the preparation of numerous federal and state tax returns containing false representations concerning the timing of TSE's income and its payment of payroll-related taxes.

~~93~~100.    Defendants knew that their representations were false at the time that they were made and/or made them recklessly. As explained above, Defendant Kossoff admitted in his sworn declaration filed with this Court that he masked TSE's liabilities. Defendants' knowledge that the representations were false when they were made is reinforced by the Defendants' eve-of-bankruptcy journal entries on TSE's books, which purported to debit the TSE/Tri-State intercompany account for tens of millions of dollars in liabilities dating back to 2012.

~~94~~101.    Defendants' false representations were material, and Defendants made them knowing that TSE's financial statements and tax returns would be relied upon by TSE's creditors.

~~95~~102.    TSE's creditors reasonably relied upon the accuracy of TSE's financial statement and tax returns. Defendants' false representations induced TSE's creditors to refrain from taking actions that would have interrupted the flow of tens of millions of dollars from TSE to or for the benefit of the Tri-State Group and Cassera. Those false representations further permitted TSE to continue to incur tens of millions of dollars of additional liabilities, long after its business would have been shut down had its true financial condition and non-payment of taxes been known.

~~96~~103.    Among other things, had TSE's true financial condition been known and/or accurate tax returns been filed, state and federal taxing authorities would have taken actions to collect TSE's massive unpaid tax liabilities and prevent the incurrence of additional unpaid tax liabilities; the administrators of state workers' compensation programs would not have permitted TSE to continue

operating as a PEO; and Lumbermen's would not have agreed to continue underwriting and administering TSE's workers' compensation insurance program.

~~97.~~104.   Defendants' false representations directly and proximately permitted TSE to incur tens of millions of dollars of additional liabilities long after its business should have been shut down, and caused creditor losses in a corresponding amount.

~~98.~~105.   As a direct and proximate result of Defendants' fraud, TSE and its creditors suffered tens of millions of dollars in damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on Counts I and II of this complaint in favor of Plaintiff, as chapter 11 trustee of TSE, and against Kossoff & Kossoff LLP and Irwin Kossoff in an amount to be determined at trial, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.


Dated: New York, New York
       ~~October 9, 018~~March 8, 2019

Respectfully submitted,

By:  /s/ Vincent E. Lazar_____

Vincent E. Lazar
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Tel. (312) 222-9350
Fax (312) 527-0484
vlazar@jenner.com

Richard Levin
Carl Wedoff
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 891-1600
Fax (212) 909-0815
rlevin@jenner.com
cwedoff@jenner.com

*Attorneys for the Chapter 11 Trustee*